J-S89003-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: Z.E.W.-C., A MINOR, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| APPEAL OF: L.Z.W., MOTHER | |
| | No. 1842 EDA 2016 |

Appeal from the Order Entered May 11, 2016
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000737-2015, CP-51-DP-0001344-2012

| | |
|---|---|
| IN THE INTEREST OF: D.A.-S.W., A MINOR, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| APPEAL OF: L.Z.W., MOTHER | |
| | No. 1843 EDA 2016 |

Appeal from the Order Entered May 11, 2016
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000738-2015, CP-51-DP-0001343-2012

BEFORE:  SHOGAN, MOULTON, and FITZGERALD,[*] JJ.

MEMORANDUM BY SHOGAN, J.:               **FILED DECEMBER 21, 2016**

---

[*]  Former Justice specially assigned to the Superior Court.

L.W. ("Mother") appeals from the order entered on May 11, 2016, terminating her parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b) to her son, D.A.-S.W., born in November of 2008, and her daughter, Z.E.W.-C., born in August of 2011 (collectively "Children").[1] We affirm.

The trial court set forth the factual and procedural background of this case as follows:

> [C]hildren were born as follows: [Z.E.W.-C.], [i]n August [of] 2011 and [D.A.-S.W. i]n November [of] 2008.
>
> On July 12, 2012, [the Department of Human Services "DHS"] received a General Protective Service (GPS) report alleging that [Mother] sold her food stamps instead of buying food for [Children]. The condition of the family home was deplorable. The home was infested with mice and roaches. Additionally, [D.A.-S.W.] and other siblings were truant from school. [Father] also resided in the home and smoked marijuana. The report was substantiated.
>
> [Mother] did not cooperate with DHS from July 13, 2012 to July 20, 2012.
>
> On August 3, 2012, [Mother] failed to appear at a Motion to Compel Hearing before the Honorable Jonathan Q. Irvine.

---

[1] The trial court also terminated the parental rights of Z.E.W.-C.'s father, S.T.C. ("Father") on May 11, 2016. Father filed a separate appeal, assigned Superior Court Docket Number 1768 EDA 2016, relating to the termination of his rights to Z.E.W.-C. Father's parental rights are addressed in his separate appeal. Regarding A.M., the father of D.A.-S.W., counsel for DHS told the court "the Department has done multiple parent locator searches. We don't have a birth date for [A.M.]" N.T., 4/5/16, at 30. The record establishes that A.M. has never been involved in the case and has never performed parental duties for D.A.-S.W. *Id*. at 32. The instant matter relates only to Mother's parental rights to Children.

Pursuant to a hearing, Judge Irvine granted the Motion to Compel Cooperation.

On August 10, 2012, Judge Irvine ordered DHS to hire a private investigator to assist with DHS's investigation.

On August 24, 2012, the private investigator located the family at a different address.

On October 31, 2012, DHS implemented In-Home Protective Services (IHPS) in the home.

DHS and IHPS determined that the home was inappropriate. The home was overcrowded and needed to be cleaned. Furthermore, [Children] looked unkempt. Moreover, DHS learned that [Children] were not up to date with their medical, dental and vision or their immunizations.

DHS was denied access to the family home from December 27, 2012 thru January, 2013. The family also resided in the family home.

On February 7, 2013, an adjudicatory hearing was held before the Honorable Jonathan Q. Irvine. Judge Irvine adjudicated [Children] dependent and committed them to the care and custody of DHS. [Children] were placed in foster care.

The matter was listed on a regular basis before Judges of the Philadelphia Court of Common Pleas-Family Court Division-Juvenile Branch pursuant to section 6351 of the Juvenile Act, 42 Pa.C.S.A. §6351, and evaluated for the purpose of determining or reviewing the permanency plan of the children.

In subsequent hearings, the [domestic relations orders] reflect the [c]ourt's review and disposition as a result of evidence presented, addressing, and primarily with, the goal of finalizing the permanency plan.

On April 5, 2016 and May 11, 2016, a Termination of Parental Rights hearing for [Mother] was held in this matter.

On May 11, 2016, the [c]ourt found by clear and convincing evidence that [Mother's] parental rights [to Children] should be terminated pursuant to the Pennsylvania Juvenile Act.

- 3 -

Furthermore, the [c]ourt held it was in the best interest of [Children] that the goal be changed to adoption.

Trial Court Opinion, 6/28/16, at unnumbered 1–2. Mother filed a timely notice of appeal; both Mother and the trial court complied with Pa.R.A.P. 1925.

Mother raises the following issues on appeal:

1. Did the Trial Court err in terminating [Mother's] parental rights under 23 Pa.C.S. Section 2511(a)(1), 2511(a)(2), 2511(a)(5), and 2511(a)(8)?

2. Did the Trial Court err in finding that termination of [M]other's parental rights best served [Children's] developmental, physical and emotional needs under 23 Pa.C.S. Section 2511(b)?

3. Did the Trial Court err in changing [Children's] goal to adoption?

Mother's Brief at vi.

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *In re R.I.S.*, 614 Pa. 275, 36 A.3d 567, 572 (Pa. 2011) (plurality). As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel-Bassett v. Kia Motors America, Inc.*, 613 Pa. 371, 455, 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, 575 Pa. 647, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of

- 4 -

discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*

As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, 539 Pa. 161, 165, 650 A.2d 1064, 1066 (Pa. 1994).

*In re I.E.P.*, 87 A.3d 340, 343–344 (Pa. Super. 2014) (quoting *In re Adoption of S.P.*, 47 A.3d 817, 826–827 (Pa. 2012)).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). We have explained that the "standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" *Id*. (quoting *In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)). Moreover, this Court may affirm the trial court's decision regarding the termination of parental rights with regard to

any one subsection of section 2511(a). *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

The trial court terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). Order, 5/11/16. We will focus on sections 2511(a)(2) and (b), which provide as follows:

**§ 2511. Grounds for involuntary termination**

(a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

(b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2) and (b). This Court has explained that the focus in terminating parental rights under section 2511(a) is on the parent, but

under section 2511(b), the focus is on the child. *In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*).

To satisfy the requirements of section 2511(a)(2), the moving party must produce clear and convincing evidence regarding the following elements: (1) repeated and continued incapacity, abuse, neglect, or refusal; (2) such incapacity, abuse, neglect, or refusal caused the child to be without essential parental care, control, or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect, or refusal cannot or will not be remedied. *In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003). The grounds for termination of parental rights under section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties. *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002). This Court has stated that a parent is required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities. *Id*. A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id.* at 340.

Mother asserts that she was compliant with her Family Service Plan ("FSP") objectives for over three months before DHS filed the petitions to terminate her parental rights. Mother's Brief at 7. She cites the FSP goals

allegedly remedied and maintains that all of the conditions that led to Children's placements no longer exist. *Id*. at 8.

Our review of the record does not support Mother's claims. The trial court noted the following in explaining Mother's noncompliance with and inability to meet her FSP goals:

> In the instant case, Dr. Erica Williams, an expert qualified in the field of forensic and clinical psychology, completed a [Parenting Capacity Evaluation ("PCE") for [Mother]. Dr. Williams concluded that [Mother] did not have the ability to provide permanency nor a safe environment for [Children]. (N.T., 4-5-16, p. 67). Dr. Williams recommended that [Mother] attend mental health treatment which included trauma focus therapy (N.T., 4-5-16, p. 72). Furthermore, Dr. Williams testified that it was imperative for [Mother] to address her specific mental issues. [Mother's] parenting capacity would be nonexistent if she failed to address her mental health issues. (N.T., 4-5-16, p. 67-68). [Mother] did not comply with the recommendations of Dr. Williams. (N.T., 4-5-16, p. 78). Furthermore, the current DHS social worker testified that [Mother] did not contact her to inquire about the needs and welfare of [Children]. She did not inquire about [Children's] schooling or therapy. (N.T., 4-5-16, p. 89). Moreover, [Mother] did not comply with all of her FSP goals. The testimony established that the original and current DHS social workers explained to [Mother] that in order to reunify with [Children] she must comply with her objectives. (N.T., 4-5-16, pgs. 39 and 78).

Trial Court Opinion, 6/28/16, at unnumbered 4.

We agree with the trial court that there is competent evidence in the record supporting its findings. Dr. Erica Williams, the Director of Forensic Services at Assessment and Treatment Alternatives, conducted a PCE of Mother. She described the evaluation as one to determine "the capacity of that parent to provide safety and permanency to the . . . children involved."

N.T., 4/5/16, at 59. Dr. Williams, who was qualified as an expert, stated that Mother "declared that all of the information provided by DHS [was] lies, that there weren't any concerns." *Id*. at 63. Dr. Williams explained that Mother admitted that her oldest child[2] was sexually abusing two of her daughters, but she took no measures to protect the girls. *Id*. at 64. Dr. Williams observed that Mother's responses:

> were as though she were a bystander to the events. So she was able to describe things that occurred but she didn't refer to herself as having a role in the events. So it was as though she had been watching them rather than the parent who should have been affecting care during it.

*Id*. at 62.

Dr. Williams testified that Mother had symptoms of depression that were consistent with a mood disorder that could be "part of a depressive category or a larger issue." N.T., 4/5/16, at 66. Dr. Williams opined that Mother did not have the ability to provide permanency and safety to Children. *Id*. at 67. The expert testified that Mother's issues could not be remedied in a short period because "you're looking at the chronicity of the depression, the abuse from her own history, the impact of her choices on [Children] and her limit to [having] no insight in her role." *Id*. at 68.

---

[2] Mother has at least five other children, three who are in her care and two who are in other foster placements or kinship homes; they are not involved in this appeal. N.T., 4/5/16, at 22, 27; N.T., 5/11/16, at 28.

The record supports the conclusion that Mother failed to comply with the FSP goal to obtain the requisite mental health intervention to enable her to develop the capacity to parent Children. Thus, Mother has not resolved the conditions necessitating Children's placement and lacks the ability to provide Children with the safety necessary for their well-being. We conclude that the trial court did not abuse its discretion in finding that Mother's parental rights should be terminated under 23 Pa.C.S. § 2511(a)(2). **Adoption of S.P.**, 47 A.3d at 826–827.

Next, we review the termination of Mother's parental rights pursuant to 23 Pa.C.S. § 2511(b). Our Supreme Court has stated:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "intangibles such as love, comfort, security, and stability." **In re K.M.**, 53 A.3d 781, 791 (Pa. Super. 2012). In **In re E.M.**, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. **In re K.M.**, 53 A.3d at 791.

**In re: T.S.M.**, 71 A.3d 251, 267 (Pa. 2013).

When evaluating a parental bond "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding

evaluation." ***In re Z.P.,*** 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted).

A parent's abuse and neglect are likewise a relevant part of this analysis:

> [C]oncluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

***In re K.K.R.-S.***, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted). Thus, the court may emphasize the safety needs of the child. ***See In re K.Z.S.***, 946 A.2d 753, 763-764 (Pa. Super. 2008) (affirming the involuntary termination of the mother's parental rights, despite the existence of some bond, where placement with the mother would be contrary to the child's best interests, and any bond with the mother would be fairly attenuated when the child was separated from her, almost constantly, for four years).

In fact, our Supreme Court has observed that the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition, and that "[e]ven the most abused of

- 11 -

children will often harbor some positive emotion towards the abusive parent." **T.S.M.**, 71 A.3d at 267 (quoting **K.K.R.-S.**, 958 A.2d at 535). The Supreme Court instructed, "[T]he continued attachment to the natural parents, despite serious parental rejection through abuse and neglect, and failure to correct parenting and behavior disorders which are harming the children cannot be misconstrued as bonding." **T.S.M.**, 71 A.3d at 267 (citation omitted).

We have explained that a parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights. **Z.P.**, 994 A.2d at 1121. Further, this Court has stated: "[A] parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." **In re B.,N.M.**, 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted). It is well settled that "we will not toll the well-being and permanency of [a child] indefinitely." **Adoption of C.L.G.**, 956 A.2d at 1007 (citing **In re Z.S.W.**, 946 A.2d 726, 732 (Pa. Super. 2008) (noting that a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting.")).

Mother's sole argument regarding 23 Pa.C.S. § 2511(b) is that the DHS social worker testified that Mother was bonded with Children therefore

"termination of Mother's rights could not be in the best interest" of Children. Mother's Brief at 10 (citing N.T., 4/5/16, at 48). Our review of the notes of testimony indicates that the DHS social worker did not testify that Mother was bonded with Children, at that page or any other. Rather, DHS social worker Tracy Woods testified that Children were safe and comfortable in the foster mother's home. N.T., 4/5/16, at 44.

Stacy Ann Barrett, the current case manager for Children, testified that even though Mother did not visit Children from August 2015 until December 2015, Children suffered no irreparable or significant harm. N.T., 4/5/16, at 80. Children never asked about Mother. *Id*. at 81. Children were only one and four years old when removed from Mother's custody and placed, together, in their current foster home. *Id*. at 83. The foster mother, who provides the primary parental bond for Children, wishes to adopt them. *Id*. Foster mother provides Children with love, safety, stability, and support and meets Children's educational and medical needs. *Id*. at 83–84. During cross-examination by the Child Advocate, Ms. Barrett stated that Z.E.W.-C. is "very attention seeking and she's constantly close with the foster parent during the visit." *Id*. at 89–90. Likewise, D.A.-S.W. receives specialized services, and the foster mother is "an active participant in those services." *Id*. at 88.

In concluding that Children's primary bond is with their foster mother and that adoption is in Children's best interests, the trial court stated as follows:

> In the instant matter, [Children] reside in the same pre-adoptive home. [Children] share their primary parental bond with the foster parent. (N.T., 4-5-1[6], p. 83). The foster parent provides them with love, safety and support. She meets their medical needs also. (N.T., 4-5-16, pgs. 83 and 84). The foster parent is active in [D.A.-S.W.'s] specialized services. She has enrolled [him] in the boy scouts. Furthermore, she has enrolled [Children] in painting class. (N.T., 4-5-16, p. 88). Moreover, when [Mother] did not visit [Children] for five months, they did not ask for her. (N.T., 4-5-16, p. 80). Additionally, [Children] would not suffer permanent /irreparable harm if the parental rights of [Mother] were terminated. Lastly, it would be in the best interest of [Children] if their goal[s] were changed to adoption. (N.T., 4-5-16, p. 84).

> In the instant case, DHS filed the petition to terminate the parental rights of . . . [Mother] and change the goal to adoption. "In those cases where reunification is not appropriate, adoption is viewed as providing the greatest degree of permanence" **In re S.H.**, 71 A.3d 973, 978 (Pa. Super. 2013).

Trial Court Opinion, 6/28/16, at unnumbered 5–6. Accordingly, it was proper for the trial court to conclude that no bond exists such that Children would suffer harm if Mother's parental rights were terminated. This Court finds no abuse of discretion in the trial court's termination of Mother's parental rights to Children pursuant to section 2511(b).

Because the trial court's factual findings are supported by the record, and its legal conclusions are not the result of an error of law or an abuse of discretion, we affirm the trial court's order involuntarily terminating Mother's

parental rights under section 23 Pa.C.S. § 2511(a)(2) and (b) and changing

the goal to adoption.[3]

Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/21/2016

_____

[3]  Mother does not make any additional argument as to why the goal for Children should not have been changed to adoption beyond reasserting that she met her FSP goals.  Mother's Brief at 11.

- 15 -